IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| SALVATORE PELULLO<br>a/k/a "Sal,"<br>a/k/a "The Consultant,"<br>a/k/a "Cousin,"<br>a/k/a "Mr. Turner," | Criminal No. 11-740-2 (RBK)<br><br>**OPINION** |
| Defendant. | |

**KUGLER**, United States District Judge:

This matter comes before the Court on the motion of the United States of America ("Government") to disqualify Mark E. Cedrone as co-counsel for Salvatore Pelullo ("Defendant"). Because the Court finds that Mr. Cedrone is likely to be a necessary witness for the Government, and because the Court finds that a conflict of interest exists between Mr. Cedrone's representation of Mr. Pelullo in this matter, and his representation of individuals significantly involved in organizations Mr. Cedrone has represented in the past, the Court grants the Government's motion to disqualify Mr. Cedrone.

**I.	BACKGROUND**

Salvatore Pelullo is a defendant in this complex criminal matter, wherein he and twelve co-Defendants are charged with having participated in various counts of a twenty-five-count Indictment alleging, among other things, conspiracies involving the Racketeer Influenced and Corrupt Organizations ("RICO") Act, securities fraud, and wire fraud. The Court initially

1

appointed Troy Archie to represent Mr. Pelullo, who is indigent, pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A.  Because of the complexity of this case, Mr. Archie requested co-counsel to assist him in representing Mr. Pelullo.  At Defendant's request, the Court appointed Mr. Cedrone as Mr. Archie's co-counsel on January 26, 2012.

On March 7, 2012, while Mr. Pelullo's motion for reconsideration of the denial of his motion for release on bail was pending, the Government filed a motion to disqualify Mr. Cedrone as Mr. Pelullo's counsel.  A brief hearing largely concerning scheduling and briefing of the disqualification motion took place on March 9, 2012.  Mr. Cedrone filed a response in opposition on March 14, 2012, along with a set of documents that make up Mr. Cedrone's file for his representation of P.S. Charters and Seven Hills.  Those documents were submitted only to the Court for <u>in camera</u> review.  The Government filed its reply on March 16, 2012.  On March 21, 2012, the Court held oral argument on this issue.  Mr. Pelullo's motion for reconsideration of the bail motion is still pending, and argument on that motion has been scheduled for April 2, 2012.

Mr. Cedrone previously represented Seven Hills Management LLC and P.S. Charters, two entities that, according to the Government, were shell companies created to help carry out the crimes that Mr. Pelullo and other Defendants allegedly committed at FirstPlus Financial Group, Inc ("FPFG").  Among other documents, the Government points to a May 16, 2008 letter from Mr. Cedrone to Assistant U.S. Attorney Steven D'Aguanno, wherein Mr. Cedrone introduces himself by explaining, "I represent PS Charters, LLC in connection [with] the Government's recent unlawful seizure of its primary asset, Priceless, an [sic] the 83 foot Falcon yacht hailing from Miami Beach, Florida."  Gov't Br,. Ex. 2.  In that letter, Mr. Cedrone seeks the immediate return by the Government of Priceless to P.S. Charters.

## II. ISSUES

The Government argues that Mr. Cedrone should be disqualified for two primary reasons: (1) Mr. Cedrone is likely to be called by the Government as a fact witness at trial; and (2) Mr. Cedrone faces a conflict of interest based on his alleged relationship with other Defendants (namely, Nicodemo S. Scarfo, John Parisi, and Cory Leshner).

Mr. Cedrone rejoins that his testimony at trial either is unnecessary to the Government's case, or falls within one of the exceptions to the disqualification mandate contained in New Jersey Rule of Professional Conduct 3.7(a). He goes on to argue that no conflict of interest exists between him and any Defendants in this trial, since Mr. Cedrone represented P.S. Charters and Seven Hills—not Mr. Pelullo as an individual or any other individual Defendant. Upon questioning by the Court at the March 21, 2012 hearing, Mr. Cedrone emphasized that he has never represented any individuals indicted in this case in any other matter. Moreover, Mr. Cedrone argues that even though Mr. Pelullo is indigent, he should be afforded his choice of counsel—particularly because, Mr. Cedrone suggests, it is "the government [that] has effectively impoverished Mr. Pelullo[,] requiring that he rely on court-appointed counsel." Def.'s Br. in Opposition to Motion to Disqualify ("Def.'s Br. Opp."), 3.

## III. NEW JERSEY RULES OF PROFESSIONAL CONDUCT AND MOTIONS FOR DISQUALIFICATION

New Jersey Rule of Professional Conduct 3.7(a) lays out the following general rule, which the Government invokes in this case: "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ." N.J. R.P.C. 3.7(a). Rule 3.7(a) also identifies three exceptions wherein an attorney's likelihood of being called as a witness does not require disqualification: where "(1) the testimony relates to an uncontested issue; (2) the

testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." Id.

Rule 3.7(a) specifically addresses a situation wherein a lawyer who is a potential necessary witness serves as an advocate "at trial." N.J. R.P.C. 3.7(a) (emphasis added). The plain language of the rule does not address an attorney's pretrial activity, nor has the New Jersey Supreme Court definitively ruled on the application of Rule 3.7(a) to pretrial activity. Main Events Productions v. Lacy, 220 F.Supp.2d 353, 356 (D.N.J. 2002). In Main Events, the court highlighted the difference between Rule 3.7(a) and the old Disciplinary Rules it replaced. The Disciplinary Rules "clearly provided that an attorney could not accept employment where he could be a witness, or must immediately withdraw upon learning or believing he would be a witness for his client or another party." Id. at 356 (citing DR 5-101(B), DR 5-102(A), and DR 5-102(B)). Thus the court found that "[t]he Rule is designed to prevent a situation in which at trial a lawyer acts as an attorney and as a witness, creating the danger that the fact finder (particularly if it is a jury) may confuse what is testimony and what is argument, and otherwise creating an unseemly appearance at trial." Id. at 357. Accordingly, Main Events endorsed "[l]imiting the disqualification to advocacy at trial." Id. However, unlike the matter currently before the Court, Main Events did not address a situation wherein the attorney not only was likely to be a witness at trial, but also faced a conflict of interest concerning other defendants.

It should be noted that "[i]n New Jersey, motions to disqualify are viewed with disfavor because disqualification is a drastic remedy with broad repercussions." Rosario v. City of Newark, 2011 U.S. Dist. LEXIS 5880 at *3 (D.N.J. Jan. 21, 2011) (citing Carlyle Towers Condominium Ass'n v. Crossland Sav., 944 F. Supp. 341, 345 (D.N.J. 1996)). Still, even though a disqualification motion "must be carefully scrutinized," Carlyle Towers, 944 F. Supp. at 345,

New Jersey state and federal courts still require that "if there is any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of disqualification." Steel v. GMC, 912 F. Supp. 724, 733 (D.N.J. 1995) (quoting Reardon v. Marlayne, Inc., 83 N.J. 460, 416 A.2d 852 (1980)).

The Government has requested that, in considering this motion, the Court conduct an evidentiary hearing regarding Mr. Cedrone's knowledge of relevant facts. In United States v. Voigt, the Third Circuit considered whether disqualification of a defendant's attorney violated his Sixth Amendment right to counsel of choice, and determined that disqualification is "arbitrary"—and therefore unconstitutional—where it is "the product of a failure to balance proper considerations of judicial administration against the right to counsel." 89 F.3d 1050, 1074 (3d Cir. 1996). The Voigt Court made clear that, although "a trial court may not deny a defendant's right to counsel of choice on the basis of generalizations alone," nevertheless that "does not stand for the proposition that a trial court's denial of a defendant's chosen counsel must be based on a hearing and supported by factual findings in order to pass constitutional muster." Id. at 1075 (quoting Fuller v. Diesslin, 868 F.2d 604, 611 (3d Cir. 1989)). Thus "[a]s long as the court makes a reasoned determination on the basis of a fully prepared record, its decision will not be deemed arbitrary." Id. (internal quotation marks omitted). Moreover, because, as explained in Section IV.C infra, Mr. Pelullo does not have the right to counsel of choice, the constitutional component of this analysis would appear to be obviated, further reducing the necessity for an evidentiary hearing. Finally, the Court declines to conduct an evidentiary hearing because the instant motion for disqualification should not serve as an occasion for the Government to conduct discovery. To the extent that factual information presented by Mr. Cedrone in connection with this motion has been integral to the Court's

5

resolution of the issues before it, the Court will identify in this Opinion those documents that were persuasive in showing the extent of Mr. Cedrone's involvement in the activities underlying this case.

## IV. DISCUSSION

### A. Mr. Cedrone's Potential to be Called by the Government as a Fact Witness

The Government claims that Mr. Cedrone's testimony may prove a critical fact at trial—namely, that "the persons who controlled Seven Hills, P.S. Charters, and Learned Associates took actions that were a part of and contributed to the criminality of the charged enterprise." Gov't Br. in Support of Motion to Disqualify ("Gov't Br."), 9. Because the Government "will also seek to establish that defendants Pelullo, Scarfo, and Parisi controlled those three shell companies," an allegation the Government anticipates that the Defendants will attempt to deny, the Government anticipates a need to interview Mr. Cedrone to establish the identity of the individuals who controlled the alleged shell companies. "At a minimum," the Government explains, it will need "to interview Mr. Cedrone in order to authenticate the letters [from Mr. Cedrone to the Government, regarding the seizure of Priceless and other assets] for trial purposes." Id. The Government further argues that some Defendants may seek to interview Mr. Cedrone about these issues as well.

1. Necessity of Mr. Cedrone's Testimony

Mr. Cedrone begins by disputing the Government's assertion that he is a "necessary" witness, as required by Rule 3.7(a). Mr. Cedrone maintains that, "because the government never sought to secure [his] testimony prior to indictment," he cannot be a useful witness to any party's examination at trial because "no party to this ligation will ever have the benefit of" anticipating how he might answer any inquiries presented to him. Def.'s Br. Opp., 12. Moreover,

6

notwithstanding Mr. Cedrone's argument that he did not represent Mr. Pelullo as an individual (a position which, as explained in Section IV.B, the Court rejects), Mr. Cedrone also argues that his interactions with others on behalf of Seven Hills and PS Charters would be subject to the attorney-client privilege. Id. Mr. Cedrone further argues that any information that the Government or other Defendants might obtain from him "would certainly be cumulative." Id. at 13.

The Government now contends, based on Mr. Cedrone's opposition brief, that Mr. Cedrone has made "startling admissions of fact" that speak to his knowledge of aspects of this matter that the Government was previously unaware of. Gov't Reply Br., 3. At the March 21, 2012 hearing, the Government stated that, based upon the information that Mr. Cedrone has already shown himself to have, the Government would be likely to call him as a witness "cold"—even without more specific knowledge of what Mr. Cedrone's testimony would be likely to convey. Specifically, the Government points to Mr. Cedrone's information concerning P.S. Charters's plan to lease Priceless.[1] More significantly, the Government also highlights Mr. Cedrone's admission to involvement, as counsel for Seven Hills, in "a possible collection action against [FPFG] in connection with a Note." Id. (quoting Def.'s Br. Opp., 5-6). The Government argues that Mr. Cedrone's statement is "an admission of his involvement in a key act taken in furtherance of the racketeering conspiracy," id., as charged in the Indictment. See Indictment, Doc. No. 1, ¶ 48 ("To complete the sale [of Premier Group], members and associates of the Enterprise caused FPFG to enter into a purchase agreement which provided that the owners of

---

[1] Given that the Government admits that it "previously knew that codefendant Cory Leshner was involved in obtaining and arranging" for the potential lease, it is unclear precisely why Mr. Cedrone's testimony—rather than the testimony of any other source from which the Government may already have discovered this information—is necessary to prove this allegation. Gov't Reply Br., 3. Moreover, at the March 21, 2012 hearing, Mr. Cedrone explained that his reference to this information is based entirely on knowledge gained after his appointment to represent Mr. Pelullo in this matter.

7

Premier Group, including Learned Associates and Seven Hills, were to receive $700,000 and 1,000,000 shares of FPFG common stock," which would be paid in part through "a series of promissory notes."). The fact that the Government considers the collection action to be a key fact in the conspiracy counts speaks to the likelihood that Mr. Cedrone will be called as a witness at trial. Furthermore, in the file Mr. Cedrone presented to the Court, Mr. Cedrone included a letter written by him to one of Mr. Pelullo's co-Defendants in an effort to enforce a promissory note tendered to Seven Hills. Thus there is a strong argument for the necessity of Mr. Cedrone's testimony.

        2. <u>Exceptions to Rule 3.7(a)</u>

Mr. Cedrone goes on to argue that one or more of the exceptions to the disqualification mandate elucidated in Rule 3.7(a) applies in this case. First, and perhaps most significantly, Mr. Cedrone argues that Mr. Pelullo does not intend to contest his involvement with P.S. Charters and Seven Hills, making his testimony subject to the Rule 3.7(a)(1) exception because it relates to an uncontested issue. <u>See</u> Def.'s Br., 13 ("Mr. Pelullo does not contest that he controlled Seven Hills and, to some extent, PS Charters, which was co-owned by Seven Hills."). Therefore, Mr. Cedrone suggests that Mr. Pelullo "is more than willing to waive his right to later claim any harm as a result of undersigned counsel being called as a witness should it turn out that undersigned counsel's testimony is relevant, not privileged and not cumulative." Def.'s Br. Opp., 14. Mr. Cedrone also indicates that, "to the extent relevant and not cumulative, Mr. Pelullo will stipulate to any fact which the government believes it could prove through undersigned counsel." <u>Id.</u> at 2. However, the Court finds that a stipulation of the kind contemplated by Mr. Cedrone is not a viable solution in this case. To begin with, it is difficult to conceive of fashioning a stipulation that would cover all of the questions for which the

Government, at the March 21, 2012 hearing, seeks Mr. Cedrone's testimony as a witness. Furthermore, in this multi-defendant case, such a stipulation threatens to run afoul of the Confrontation Clause. Moreover, as the Government pointed out at the March 21, 2012 hearing, there is nothing to prevent a withdrawal of the stipulation by Mr. Pelullo later in this litigation, once he and the other Defendants have had more of an opportunity to peruse the evidence produced by the Government and plan their respective defenses. Finally, even in the unlikely event that such a stipulation were able to be constitutionally fashioned, the Court would nonetheless be compelled to instruct the jury that it is "not required" to "treat [the stipulated facts] as having been proved," since "you [the jury] are the sole judge of the facts." 3d Cir. Model Criminal Jury Instructions, 2.03. This is because "[i]n a criminal case, the jury is not necessarily bound by a stipulation between the parties." Id., cmt.

Mr. Cedrone further argues that his testimony would fall under the second exception to Rule 3.7(a) because it would "relate to the nature and value of legal services rendered" to P.S. Charters. Mr. Cedrone offers no support for this conclusion. The Government has not suggested that the "value" of Mr. Cedrone's legal services are at issue and, moreover, what the Government appears to seek from Mr. Cedrone is proof of Mr. Pelullo's relationship to P.S. Charters and Seven Hills—not information about what role Mr. Cedrone played (i.e., "the nature of his services") in those companies. Accordingly, this exception is not applicable.

Third, Mr. Cedrone's statement that his disqualification will inflict "substantial hardship" on Mr. Pelullo—and therefore fall under exception 3.7(a)(3)—is conclusory. Because an indigent defendant does not have a constitutional right to counsel of his choice, it cannot be argued that the disqualification of Mr. Cedrone—Mr. Pelullo's appointed co-counsel—would create a substantial hardship. Moreover, the Court notes that Mr. Cedrone has been appointed to

represent Mr. Pelullo in this matter for less than two months, during which time Mr. Cedrone's potential disqualification has been at the forefront of Mr. Pelullo's case, at the expense of motions such as Mr. Pelullo's motion for reconsideration of denial of his bail.  Given that the Court has entered a complex case order in this matter, and it is anticipated that the case is many months away from trial, two months is not a substantial amount of time in the overall duration of Mr. Pelullo's defense.  This is particularly true given the volume of discovery at issue in this matter—an estimated one million pages of documents, as well as 60.4 gigabytes of electronic files whose method of production the parties have only agreed upon within the several days preceding this writing.   Therefore, despite Mr. Cedrone's undisputed talents as a criminal defense attorney, it cannot reasonably be argued that Mr. Cedrone's contribution to Mr. Pelullo's defense has been so vast at this juncture that its loss constitutes a substantial hardship.

**B. Mr. Cedrone's Alleged Conflict of Interest with Other Defendants**

The Government also argues that Mr. Cedrone should be disqualified from representation of Mr. Pelullo because Mr. Cedrone's representation of Seven Hills and P.S. Charters creates a conflict of interest between Mr. Pelullo and other Defendants allegedly involved in those companies.  Mr. Cedrone responds that he represented the companies themselves, and not the individuals involved in Seven Hills and P.S. Charters.  Moreover, Mr. Cedrone argues that, because his interests are not adverse to those of his current client, he cannot be disqualified.

Mr. Cedrone's attempt to distinguish his representation of Seven Hills and P.S. Charters from any representation of Mr. Pelullo's co-Defendants does not properly acknowledge the ethical rule governing these circumstances.  New Jersey Rule of Professional Conduct 1.13(a)— "Organization as Client"—reads as follows:

> A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other

> constituents. For the purposes of RPC 4.2 and 4.3, however, <u>the organization's lawyer shall be deemed to represent not only the organizational entity but also the members of its litigation control group</u>. Members of the litigation control group shall be deemed to include current agents and employees responsible for, or significantly involved in, the determination of the organization's legal position in the matter whether or not in litigation, provided, however, that "significant involvement" requires involvement greater, and other than, the supplying of factual information or data respecting the matter. Former agents and employees who were members of the litigation control group shall presumptively be deemed to be represented in the matter by the organization's lawyer but may at any time disavow said representation.

N.J. R.P.C. 1.13(a) (emphasis added). The Government's allegation is that several co-Defendants in addition to Mr. Pelullo were each "significantly involved" in P.S. Charters and/or Seven Hills (an allegation that, according to Mr. Cedrone, Mr. Pelullo does not contest). Therefore, if this allegation is correct, Rule 1.13(a) provides that Mr. Cedrone is deemed to have represented all of these co-Defendants in addition to the organizations they are said to have directed. It is unclear to what extent the Defendants will offer to waive this conflict—and to what extent such a waiver would be protected from a Defendant's withdrawal of it at a later date. It is also unclear at this early stage which Defendants would need to agree to such a waiver.

At the hearing on March 21, 2012, Mr. Cedrone indicated that Mr. Pelullo was the only Defendant involved in Mr. Cedrone's representation of P.S. Charters and Seven Hills. If true, this would suggest that only Mr. Pelullo was "significantly involved" in the companies for the purposes of Mr. Cedrone's representation under Rule 1.13(a). However, Mr. Cedrone's brief frames the matter more ambivalently: "Throughout the entire time that undersigned counsel represented PS Charters and Seven Hills, he primarily interacted with Salvatore Pelullo. Occasionally, counsel interacted with others who counsel understood to possess information relevant to the dispatch of counsel's representational responsibilities." Def.'s Br. Opp., 6. These statements do not allay the Court's concern that Defendants other than Mr. Pelullo are likely to have held managerial roles in the companies represented by Mr. Cedrone, making them

represented by Mr. Cedrone under Rule 1.13(a). (In fact, Mr. Cedrone indicates that Mr. Pelullo "controlled Seven Hills, which was a fifty percent (50%) owner of PS Charters," Def.'s Br. Opp., 9, leading to the necessary conclusion that at least half of P.S. Charters was controlled by someone other than Mr. Pelullo.)

Furthermore, the file submitted by Mr. Cedrone for in camera review contradicts the statements made so unequivocally by Mr. Cedrone on March 21, 2012 that no Defendants other than Mr. Pelullo were significantly involved in P.S. Charters or Seven Hills, and that he consulted only with Mr. Pelullo in representing those two entities. Rather, Mr. Cedrone's file serves to intensify the Court's concern as to the involvement of other Defendants in P.S. Charters and Seven Hills. The billing statements contained in the file list numerous interactions between Mr. Cedrone and co-Defendants other than Mr. Pelullo.[2] For example, a November 11, 2008 invoice submitted by Mr. Cedrone's law firm to "PS Charters c/o Seven Hills Management," lists six entries detailing e-mail correspondence[3] with a co-Defendant who is not Mr. Pelullo. Moreover, it discusses e-mail correspondence with another co-Defendant "re: payment of Notes" and "Acknowledgement of Debt"—apparently referencing the same promissory notes mentioned in Section IV.A.1. An invoice dated August 5, 2008 lists a meeting with a co-Defendant concerning the same collection action, and also contains other entries for e-mail correspondence with a co-Defendant. An invoice dated July 8, 2008 reflects two entries for e-mail

---

[2] The Court recognizes that the names of those individuals with whom Mr. Cedrone consulted in his representation of Seven Hills and P.S. Charters are not protected by the attorney-client privilege (assuming that any such privilege exists in this case—an assumption that Mr. Cedrone would appear to rebut, having declared at the March 21, 2012 hearing that he does not represent any co-Defendants other than Mr. Pelullo). See United States v. Liebman, 742 F.2d 807, 809 (3d Cir. 1984) (explaining that "[i]t is well established that absent unusual circumstances the identity of the client does not come within the attorney-client privilege" (internal quotation marks omitted)). Nevertheless, the Court will not at this time disclose the names of the co-Defendants involved in this Opinion, because, as explained above, the Court does not intend that the disqualification motion should provide an opportunity for the Government to receive discovery.

[3] The Court has not received these e-mails in hard copy or any other form; the Court is aware of e-mail correspondence only through references in the billing records submitted to the Court by Mr. Cedrone.

correspondence with a co-Defendant. A June 19, 2008 invoice lists meetings not only with Mr. Pelullo but also with unidentified "others," meetings with another co-Defendant, as well as e-mail correspondence with yet another co-Defendant. Accordingly, Mr. Cedrone's file creates a strong inference that his representation of Seven Hills and P.S. Charters formed an attorney-client relationship between Mr. Cedrone and Defendants other than Mr. Pelullo. This establishes a distinct possibility that a conflict of interest now exists between Mr. Cedrone's representation of Mr. Pelullo, and his previous representation of other co-Defendants.

In <u>Government of Virgin Islands v. Zepp</u>, the Third Circuit comprehensively considered the issue of an attorney's disqualification due to a conflict of interest in a situation involving multiple defendants. 748 F.2d 125 (3d Cir. 1984). Specifically, the Court of Appeals found that ineffective assistance of counsel claims arise from conflicts of interest in cases involving "multiple representation of clients," where "the conflict exists between the interests of one defendant and the interests of other defendants served by the same attorney." <u>Id.</u> at 135. However, the <u>Zepp</u> Court cautioned that "multiple representation or merely the possibility of conflicting interest does not constitute a constitutional violation"—that is, "[t]he conflict of interest must be actual." <u>Id.</u> at 135-36 (internal quotation marks omitted).[4]

The Third Circuit has held that a defendant may waive his or her right to conflict-free counsel. <u>United States v. Moscony</u>, 927 F.2d 742, 749 (3d Cir. 1991). However, the Court of Appeals cautioned, this does not mean that the trial court should not enforce the applicable rules of professional conduct where an actual conflict of interest is located:

---

[4] It is noteworthy that, in <u>Zepp</u>, the Court of Appeals appeared particularly concerned about counsel's own potential criminal—or, at least, unethical—involvement in the activity with which his client was charged. <u>See Zepp</u>, 748 F.2d at 136 (explaining that, because counsel was present and alone with the defendant when the latter flushed cocaine down the toilet, counsel was "potentially liable for aiding and abetting or encouraging the destruction of evidence," and at least "could have faced severe disciplinary consequences"). In this case, the Government indicated at the March 21, 2012 hearing that it does not question Mr. Cedrone's personal involvement in the alleged criminal activity in a manner that seems analogous to the situation in <u>Zepp</u>.

13

> Usually, the various rights and duties of the attorney clash when a defendant seeks to waive his right to conflict-free representation in circumstances in which the counsel of his choice may have divided loyalties due to concurrent or prior representation of another client who is a co-defendant, a co-conspirator, or a government witness. Such a waiver, however, does not necessarily resolve the matter, for the trial court has an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver. Moreover, to protect the critically important candor that must exist between client and attorney, and to engender respect for the court in general, the trial court may enforce the ethical rules governing the legal profession with respect both to client-attorney communications and to conflict-free representation, again regardless of any purported waiver. Finally, the court has an independent interest in protecting a fairly-rendered verdict from trial tactics that may be designed to generate issues on appeal.

Id. The Moscony Court reiterated the Third Circuit's earlier statement, approvingly cited by the Supreme Court, that "[w]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform to with [sic] the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant." United States v. Dolan, 570 F.2d 1177, 1184 (3d Cir. 1978) (cited in Wheat v. United States, 486 U.S. 153, 162 (U.S. 1988)).

This Court is wary of entertaining an agreement to waive Mr. Cedrone's alleged conflict of interest where such agreement may hamper a co-Defendant's ability to present an individual defense; in such a situation, there would certainly be an actual conflict of interest, as well as constitutional concerns. It is difficult for the Court to know conclusively whether an actual conflict of interest exists at this stage, without knowing what kind of defense Mr. Pelullo or any of his co-Defendants will choose to present. As the Supreme Court explained in Wheat, "[u]nfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly." Wheat v. United States, 486 U.S. 153, 162 (1988). The Wheat

14

Court therefore held that "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Id. at 163.  The Supreme Court reached this conclusion despite acknowledging the possibility that the Government "may seek to 'manufacture' a conflict of interest in order to prevent a defendant from having a particularly able defense counsel at his side." Id.  Affirming that "[t]he District Court must recognize a presumption in favor of petitioner's counsel of choice," the Court also held that "that presumption may be overcome not only by a demonstration of actual conflict but a showing of a serious potential for conflict" as well.  Id. at 164 (emphasis added).

In this case, where Mr. Cedrone's records suggest that his representation of Seven Hills and P.S. Charters led to the formation of an attorney-client relationship between Mr. Cedrone and Defendants other than Mr. Pelullo, the Court finds a serious potential for a conflict of interest that weighs in favor of disqualification of Mr. Cedrone.

### C. Right to Counsel of an Indigent Defendant

Mr. Cedrone argues that it is "an omnipresent theme" of the instant dispute that "because Mr. Pelullo is indigent he has no right to counsel of his choice." Def.'s Br., 19.  However, as Mr. Cedrone acknowledges, this is an accurate statement of the law.  In Wheat, the Supreme Court held that, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." 486 U.S. at 159.  Mr. Cedrone suggests that this proposition is less true in a situation "where an indigent defendant . . . desires a

15

particular lawyer to be involved in the case and that lawyer is willing to accept the case on a court-appointed basis" (as opposed to a situation wherein an indigent defendant simply does not like his court-appointed attorney). Def.'s Br., 19. In fact, the former appears to have been precisely the situation before the Supreme Court in Wheat, where a defendant requested the representation of an attorney representing his co-defendant, and where all co-defendants agreed to waive the conflict. The Supreme Court held that the district court did not abuse its discretion in finding the conflict unwaivable, and first articulated the principle that indigent defendants do not enjoy the right to appoint counsel of their choosing. Furthermore, Mr. Cedrone underscores the fact that Mr. Pelullo has been rendered indigent by the instant investigation and indictment; however, he points to no case law that would suggest that the circumstances by which a defendant becomes indigent are relevant to the legal rule espoused in Wheat.

V.    CONCLUSION

The Court finds that serious potential for a conflict of interest between Mr. Cedrone's representation of Mr. Pelullo, and Mr. Cedrone's prior representation of companies with which other co-Defendants are likely to have significant involvement, requires Mr. Cedrone's disqualification. Although the Court cannot know whether the defense that any of the Defendants in this case will offer will render their interests adverse to Mr. Pelullo's, the Supreme Court has offered lower courts discretion in assessing the likelihood of the existence of an actual conflict of interest precisely because of the incipient stage at which this determination must be made. Because Mr. Cedrone appears to have represented Defendants other than Mr. Pelullo through his representation of Seven Hills and P.S. Charters, the likelihood of an actual conflict of interest is alarming. This, combined with the potential for Mr. Cedrone to be called as a witness at trial, militates in favor of his disqualification.

Moreover, District of New Jersey courts have held, following the New Jersey Supreme Court, that, in considering a motion to disqualify, a court must "balance 'the need to maintain the highest standards of the [legal] profession' against 'a client's right to freely choose his counsel.'" Steel v. GMC, 912 F. Supp. 724, 733 (D.N.J. 1995) (quoting Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 205, 536 A.2d 243, 245 (1988)).  Because Mr. Pelullo does not have the right to freely choose his counsel, much less his attorney's co-counsel,[5] the balance in this case appears to shift in favor of close adherence to the ethical standards of the legal profession, which counsel the avoidance of conflicts of interest and which inveigh against allowing an attorney who is a necessary witness to advocate at trial.  Accordingly, despite the Court's appreciation for Mr. Cedrone's willingness to take on this complex and time-consuming appointment, the Court **GRANTS** the Government's motion for disqualification of Mr. Cedrone.

Date: 3/23/2012          /s/ Robert B. Kugler
ROBERT B. KUGLER
United States District Judge

---

[5] In fact, in Wheat, the defendant requested that his co-defendant's attorney be retained, if not as his only attorney, then as co-counsel.  See Wheat, 486 U.S. at 158 (explaining that the district court had declined "to allow the substitution or addition of Iredale as trial counsel for petitioner").